REPORTED

IN THE COURT OF SPECIAL APPEALS
OF MARYLAND

No. 2384

September Term, 2013

_____

STATE OF MARYLAND

v.

JERMAINE HAILES

_____

Eyler, Deborah S.,
Kehoe,
Moylan, Charles E., Jr.
 (Retired, Specially Assigned),

                        JJ.

_____

Opinion by Moylan, J.

_____

Filed: May 27, 2014

This State appeal from an adverse suppression ruling in the Circuit Court for Prince George's County presents us with a bounteous smorgasbord of evidentiary and constitutional issues. Among them are 1) the Dying Declaration as the "granddaddy" of the firmly-rooted exceptions to the Rule Against Hearsay; 2) the impact, if any, of the Confrontation Clause on the Dying Declaration pursuant to the recent reinterpretation of that clause in Crawford v. Washington, 541 U.S. 36, 124, S. Ct. 1354, 158 L. Ed. 2d 177 (2004); and 3) the suppressability of an extrajudicial identification from a photographic array based on the reliability factors spelled out in Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). It is a lot to digest under a 28-day time gun.

At the outset, let one thing be clear. The issue of the admissibility of a Dying Declaration (even with its complicating Confrontation Clause aspects), on the one hand, and that of the pretrial suppression of a photographic identification, on the other, are separate and distinct. They do not collapse into each other to produce some amorphous hybrid. If there was a fatal flaw at the suppression hearing, such an agglomeration of issues was a significant part of it.

### The State Appeal

The appellee, Jermaine Hailes, was indicted by the Grand Jury for Prince George's County on December 11, 2012 on charges of 1) first-degree murder, 2) armed robbery, 3)

conspiracy, and 4) possession of a firearm by a prohibited person. He moved pretrial to have the victim's identification of him as the shooter suppressed. Following a hearing on November 1, 2013, the hearing judge filed an Opinion and Order of Court suppressing the identification. The State has filed a timely appeal.

The State appeal is authorized by Maryland Code, Courts & Judicial Proceedings Article, § 12-302(c)(3), which, in pertinent part, provides:

> (c) *Appeals by State in criminal cases* – In a criminal case, the State may appeal as provided in this subsection.
>
> ....
>
> (3)(i) <u>In a case involving a crime of violence</u> as defined in § 14-101 of the Criminal Law Article, and in cases under §§ 5-602 through 5-609 and §§ 5-612 through 5-614 of the Criminal Law Article, <u>the State may appeal from a decision of a trial court that excludes evidence offered by the State</u> or requires the return of property alleged to have been seized in violation of the Constitution of the United States, the Maryland Constitution, or the Maryland Declaration of Rights.
>
> (ii) The appeal shall be made before jeopardy attaches to the defendant. However, in all cases the appeal shall be taken no more than 15 days after the decision has been rendered and shall be diligently prosecuted.
>
> (iii) Before taking the appeal, the State shall certify to the court that the appeal is not taken for purposes of delay and that the evidence excluded or the property required to be returned is substantial proof of a material fact in the proceeding. <u>The appeal shall be heard and the decision rendered within 120 days of the time that the record on appeal is filed in the appellate court.</u> Otherwise, the decision of the trial court shall be final.

- 2 -

(Emphasis supplied).  The record in this case was filed in this Court on January 29, 2014.

Accordingly, our decision must be rendered no later than May 29, 2014.  We heard oral

argument on May 1.

## The Defendant's Challenge To The State Appeal

The appellee challenges the State's right to take an interlocutory appeal in this case

and asks that we dismiss the appeal.  He is preliminarily correct that the State may only

appeal in a criminal case if expressly authorized to do so by the Legislature.  Rush v. State,

403 Md. 68, 98-103, 939 A.2d 68 (2008) (In Rush, the Court recognized the legislatively-

authorized right of the State to appeal the pretrial suppression of a confession on the ground

that it violated the Fifth Amendment privilege against compelled self-incrimination.); Mateen

v. Saar, 376 Md. 385, 399-405, 829 A.2d 1007 (2003); State v. Green, 367 Md. 61, 71-80,

785 A.2d 1275 (2001).

The specific challenge to the ostensible statutory authority for this appeal is one of

first impression and focuses on the following provision of § 12-302(c)(3)(i):

> [T]he State may appeal from a decision of a trial court that excludes evidence
> offered by the State or requires the return of property alleged to have been
> seized in violation of the Constitution of the United States, the Maryland
> Constitution, or the Maryland Declaration of Rights.

(Emphasis supplied).

The prerequisite for a State appeal is that the exclusionary ruling must have been

based on constitutional grounds.  The ruling by the suppression hearing court that is the

gravamen of this appeal was that a dying declaration would be excluded from evidence

because its introduction would violate the appellee's Sixth Amendment right to confront the witnesses against him. There may have been (although it is not absolutely clear) a second constitutional basis for the exclusion, to wit, that the extrajudicial identification made by the dying declarant was constitutionally unreliable in ostensible violation of Neil v. Biggers, supra; Manson v. Brathwaite, supra; and the Due Process Clause.

The definitive analysis (and the only truly probing examination) of the required subject matter for a State appeal pursuant to § 12-302(c)(3) is the opinion of the Court of Appeals in Derry v. State, 358 Md. 325, 748 A.2d 478 (2000). The entitlement of the State to take, under certain conditions, an interlocutory appeal from the pretrial suppression of evidence on constitutional grounds was first made a part of Maryland law by Chap. 493 of the Acts of 1982. Judge Raker's opinion for the Court of Appeals in Derry held squarely that the State did not enjoy a right to appeal in a case where the suppression had been based upon a violation of Maryland Code, Courts & Judicial Proceedings Article, § 10-411(c), the Maryland Wiretapping and Electronic Surveillance Act. To justify a State appeal, the suppression must be based on constitutional grounds and not on statutory grounds.

> Of utmost importance is the fact that the Circuit Court's order of suppression was grounded solely upon the Wiretap Act.

358 Md. at 335. The appeal in Derry was, therefore, improper.

The Court of Appeals's interpretation of legislative intent is that the State's grievance, to be appealable, must be of "constitutional magnitude."

- 4 -

The General Assembly patently intended that <u>the limitation of interlocutory appeals to issues of constitutional magnitude</u> apply to a trial court decision that ... "excludes evidence" ... <u>[T]he court's finding of a constitutional violation is a necessary precondition to the availability to the State of an interlocutory appeal in the specified criminal cases.</u>

358 Md. at 339 (emphasis supplied). Judge Raker's opinion looked at the lay of the land both before and after 1982.

Reading § 12-302(c)(3) <u>to permit the State to challenge by interlocutory appeal only constitutionally based exclusions of evidence is more consonant with the long-time unavailability of interlocutory appeals</u> that served as precedent to the statute's original passage <u>in 1982. Prior to that year, Maryland law afforded the State no opportunity to pursue an interlocutory appeal in a criminal case.</u> It was against this backdrop that <u>the General Assembly determined to create a right of interlocutory appeal for the State in only a limited number of criminal prosecutions</u> while explicitly restricting this right in other ways.

358 Md. at 340 (emphasis supplied).

From the beginning of its analysis to the end, the distinction guiding the Court's interpretation of the statute was that separating matters of constitutional gravity from matters of less than constitutional gravity.

We therefore believe <u>the more reasonable interpretation of § 12-302(c)(3) is</u> that <u>its limitation to constitutional issues,</u> like all other limitations within the statute, applies to every exercise by the State of its right to interlocutory appeal.

... [W]e find that <u>the language of § 12-302(c)(3)(i) reveals a legislative intent to deny the State a right of interlocutory appeal of a trial court's exclusion of evidence on non-constitutional grounds.</u>

358 Md. at 341 (emphasis supplied).

The Court of Appeals concluded its analysis by stressing the General Assembly's focus on "constitutionally based suppressions."

> [T]he legislative history of § 12-302(c)(3) makes all the more evident that through its enactment the General Assembly sought to subject to immediate judicial review at the State's request only constitutionally based suppressions.

358 Md. at 341 (emphasis supplied).

The appellee, however, posits a radically different reading of § 12-302(c)(3). Instead of focusing on the distinction between a constitutional violation and a sub-constitutional violation, he would limit the subject matter of the State's appeal to the exclusion of "property ... seized." Under the appellee's cramped interpretation, the State's right to appeal would be limited, therefore, to the exclusion of tangible property, to wit, the type of property that could be physically "seized" as opposed to other types of evidence that could only be overheard or observed or smelled. It would not extend, for instance, to the exclusion of an intangible extrajudicial identification obtained in violation of either the Sixth Amendment right to counsel or the Fourteenth Amendment interest in reliability. It would not apply to the exclusion of an intangible confession taken in violation of the Fifth Amendment or the Sixth Amendment. It would not apply to the exclusion of testimonial hearsay the introduction of which might offend the Confrontation Clause of the Sixth Amendment.

Presumably, it would not apply to even a Fourth Amendment violation consisting only of an unreasonable search with no concomitant seizure. Imagine the non-appealable scenarios arising from circumstances such as those in United States v. Knotts, 460 U.S. 276,

- 6 -

103 S. Ct. 1081, 75 L. Ed. 2d 55 (1983) (hearing an intangible beeper signal); United States v. Karo, 468 U.S. 705, 104 S. Ct. 3296, 82 L. Ed. 2d 530 (1984) (the same); California v. Ciraolo, 476 U.S. 207, 106 S. Ct. 1809, 90 L. Ed. 2d 210 (1986) (the intangible view into the curtilage from the air); Dow Chemical Co. v. United States, 476 U.S. 227, 106 S. Ct. 1819, 90 L. Ed. 2d 226 (1986) (the same); Florida v. Riley, 488 U.S. 445, 109 S. Ct. 693, 102 L. Ed. 2d 835 (1989) (the same); or even Katz v. United States, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (the hearing of an intangible conversation). None of those cases involved the actual physical seizure of tangible property. There were searches, to be sure, but no seizures. Are such exclusionary rulings, therefore, exempt from appellate challenge under § 12-302(c)(3)? We think not.

We will not attribute to the Maryland General Assembly of 1982 so narrow and nonsensical a purpose. The transparent legislative purpose was to permit the State to appeal from the pretrial suppression of evidence on constitutional grounds. It is absurd to think that the General Assembly intended to exempt from such a measure all exclusionary decisions based on the Fifth Amendment, on the Sixth Amendment, and on a significant fraction of the Fourth Amendment. Indeed, Derry v. State, 358 Md. at 341, quotes with approval the legislative summary of § 12-302(c)(3)'s purpose:

> Within the Department of Legislative Reference's bill file on Senate Bill 39, the 1982 legislative proposal to create § 12-302(c)(3), see 1982 Laws of Maryland, Ch. 493, there appears a summary explaining the effect of the proposed amendment as follows:

> The bill allows the State to appeal from a pretrial ruling by the Court to exclude evidence obtained in violation of the defendant's constitutional rights. The bill is aimed at those cases in which the Judge excludes a defendant's confession, physical evidence (such as drugs), or any evidence which is at the heart of the State's case. The State may not take the appeal unless it certifies that the evidence is "substantial proof of a material fact in the proceeding."

> Bill File Document entitled "S.B. 39 – Criminal Cases – State's Right to Appeal," at 1.

(Emphasis supplied).

The appellee has nonetheless raised a creative challenge of first impression. In § 12-302(c)(3), what precisely is the function of the verb "seized" in the past tense and passive voice? Its purpose, we do not hesitate to conclude, is to identify the property that is the subject matter of a possible order for "the return of property." The "decision of a trial court" that may trigger a State appeal can be either of two types. The first is one that "excludes evidence offered by the State." It is the broader of the two types and has obvious reference to tangible and intangible evidence alike.

The second of the two types is narrower and refers, by definition, only to tangible evidence. It is that which "requires the return of property alleged to have been seized ..." The police may be directed to return to a citizen that property which they earlier "seized" from that citizen. A decision affecting tangible "property" is by its very nature narrower than a decision affecting "evidence" generally. An intangible thing such as a confession obviously may be suppressed. It is not, however, "property" that may be ordered to be returned to the

- 8 -

lips of the confessor. The tangible property limitation on the second of the disjunctive types of decision self-evidently does not apply to the vastly broader first type of decision. "Seized" refers to property to be returned, not to evidence to be excluded. Either type of decision clearly may be appealed by the State.

The Derry v. State case itself involved the recording of a conversation and not the seizure of property. In view of Derry's exhaustive analysis of § 12-302(c)(3) generally, we are not inclined to attribute Derry's failure even to mention the "non-seizure" of the conversation to a failure to appreciate the ostensible significance of such a limitation. The State's entitlement to challenge the pretrial suppression on constitutional grounds of critical evidence is self-evidently broader than a mere right to challenge the exclusion of physical things that might sit on a shelf in the police property room. Both the significance of the evidence and the significance of a constitutional challenge are more embracive concepts.

Constitutional rulings leading to the pretrial suppression of such intangible things as confessions have routinely been treated as subject to challenge by way of a State appeal. State v. Luckett, 413 Md. 360, 993 A.2d 25 (2010); State v. Luckett, 188 Md. App. 399, 981 A.2d 835 (2009); State v. Rush, 403 Md. 68, 939 A.2d 689 (2008); State v. Rush, 174 Md. App. 259, 921 A.2d 334 (2007); State v. Rucker, 374 Md. 199, 821 A.2d 439 (2003); State v. Thomas, 202 Md. App. 545, 33 A.3d 494 (2011). We find no merit in the appellee's challenge to the State's appeal.

## I.  The Dying Declaration In This Case

The extrajudicial identification in issue was made by the ultimate murder victim, Melvin Pate, on November 26, 2010.  As of the suppression hearing on November 1, 2013, however, Melvin Pate had died.  The State's evidence as to the identification came in the form of Pate's dying declaration, attested to by Registered Nurse Tina Keener and witnessed by her and others at the Shock Trauma Unit of the University of Maryland Hospital in Baltimore on November 26, 2010.  The first issue before the hearing judge, and before us, is that of whether Pate's identification of the photograph of his shooter qualified under the Dying Declaration exception to the Rule Against Hearsay according to traditional evidentiary principles.

The Maryland evidentiary rule governing the Dying Declaration is now Rule 5-804(b)(2), which provides:

> (b)  *Hearsay exceptions*.  The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> ...
>
> (2) *Statement under belief of impending death.*  In a prosecution for an offense based upon an unlawful homicide, attempted homicide, or assault with intent to commit a homicide or in any civil action, a statement made by a declarant, while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be his or her impending death.

The rule expands slightly what had been the Maryland common law with respect to the

Dying Declaration, but the expansion is not pertinent to the issue now before us.[1]

The Maryland caselaw on the Dying Declaration exception is not extensive. Judge

James Eyler's description of the exception in Perez v. State, 155 Md. App. 1, 38-39, 841

A.2d 372 (2004), fully captures the evidentiary principle.

> Under Md. Rule 5-804(b)(2), if the declarant is unavailable as a witness in a homicide prosecution, the rule against hearsay does not exclude a "statement made by a declarant, while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be his or her impending death." The statement may be made in response to a question, but must reflect the victim's personal knowledge. Statements identifying the person who shot the victim fall within this rule.

> The admissibility of a dying declaration depends on whether, at the time the victim made the statement, he or she believed that death was impending. "The required abandonment of all hope of recovery may be proved by the declarant's statement or by others' statements to the declarant, or it may be inferred from the circumstances[,]" including "the fatal quality of the wound." It is not "necessary for the victim to state that she expected to die. It is sufficient if her condition is such (and she is aware of it) as to warrant an inference of impending death." For example, a shooting victim's request for a priest or for someone to take care of her child may indicate the victim's belief in her impending death. Alternatively, a statement by another

---

[1]This case is before us on the State's appeal from an adverse suppression ruling. What was suppressed was the dying declaration of Melvin Pate for the reason that, under Crawford v. Washington, it did not satisfy the Confrontation Clause of the Sixth Amendment. What is not before us (and we offer no opinion in that regard) is the question of to which of the charges in this case the dying declaration, even if it survives the confrontation challenge, would be admissible as evidence. What is also not before us is the subissue of whether the enhanced definition of Rule 5-804(b)(2) might now cover more of the charges than would be covered by the traditional common law definition of a dying declaration. The admissibility of the dying declaration on the murder charge seems clear, but what of the other charges? See footnote 9, infra.

- 11 -

person to the victim, or in the victim's presence, might establish that the victim heard something that caused her to believe that she was likely to die soon.

(Emphasis supplied) (citations omitted). See also Connor v. State, 225 Md. 543, 550-54, 171 A.2d 699 (1961); Damm v. State, 128 Md. 665, 667-68, 97 A. 645 (1916); Meno v. State, 117 Md. 435, 437, 83 A. 759 (1912); Hawkins v. State, 98 Md. 355, 356-57, 57 A. 27 (1904); Worthington v. State, 92 Md. 222, 241, 244, 48 A. 355 (1901); Head v. State, 171 Md. App. 642, 644-63, 912 A.2d 1 (2006); Jones v. State, 38 Md. App. 288, 297-301, 380 A.2d 659 (1977); Chandler v. State, 7 Md. App. 646, 652, 256 A.2d 695 (1969).

In Joseph F. Murphy, Jr., Maryland Evidence Handbook, § 802(c) (3d ed. 1999), reference is made to the mild Maryland expansion of the rule over the common law original.

> The dying declarations exception was once limited to homicide prosecutions. Md. Rule 5-804(b)(2) extends this exception to "attempted homicide, or assault with intent to commit a homicide or in any civil action." To be admissible, the declarations must relate to the immediate cause of death or injury, and must be made at a time when the declarant believed that death was near and certain.

In 6A Lynn McLain, Maryland Evidence: State and Federal, § 804(2):1b (3d ed. 2013), Professor McLain summarized the basic common law original:

> The Maryland common law recognized a hearsay exception for dying declarations, so that the hearsay rule did not exclude a statement (1) made by a declarant (who had become deceased by the time of trial), (2) relating to the circumstances and events immediately leading up to his death and (3) made while the declarant was aware that death was imminent and had no hope of recovery, but only (4) in a prosecution for the homicide of the declarant. The

statement was admissible only if the declarant actually died, although the death need not have been almost immediate.[2]

Turning to the present case, it is, of course, required that the declarant be unavailable as a witness. At the suppression hearing on November 1, 2013, the declarant Melvin Pate was unavailable, having died on November 27, 2012.

---

[2]In § 804(2):1c, Professor McLain also points out several of the subtle expansions that Maryland Rule 5-804(b)(2) has now made in Maryland's application of the exception:

> Md. Rule 5-804(b)(2) continues the pre-Title 5 case law requirements that (1) the statement must have been made while the declarant believed that his death was imminent and (2) it must concern the cause or circumstances of what the declarant believed to be that impending death; statements relating to other matters are not admitted under this exception.
>
> But Md. Rule 5-804(b)(2) expands the common law hearsay exception by removing the requirement that the declarant die. Under the Rule, the declarant need only be unavailable to testify at trial under Md. Rule 5-804(a), which could be because of death or any other listed reason, for example, illness or lack of memory. Thus, the qualifying statement of a declarant who is now comatose, but still alive, will not be excluded by the hearsay rule.
>
> Md. Rule 5-804(b)(2) also broadens the common law hearsay exception by making the dying declarations admissible not only in a prosecution for the declarant's homicide, but for any person's unlawful homicide, attempted homicide, or assault with intent to commit a homicide, or in any civil action. The defendant may be charged, for example, with intent to kill either the declarant or another victim, or may be sued civilly for any cause of action.

(Emphasis supplied).

## A. The Severity of the Injuries

The severity of the injuries to Melvin Pate implicates two of the questions before the suppression hearing: 1) Pate's awareness of the imminence of death and 2) Pate's competence to give a meaningful declaration.

Melvin Pate was shot in the face on November 22, 2010. He was initially taken to the Prince George's County Hospital for emergency stabilization. On November 24, he was flown to the Shock Trauma Unit in Baltimore, where he came under the supervising care of, among others, a neuro-trauma critical care nurse, Registered Nurse Tina Keener. When admitted to Shock Trauma, Pate's condition was listed as "critical" and "very unstable." His spinal cord was severed at the fifth cervical vertebra in his neck, rendering him a quadriplegic. He was also suffering "neurogenic" shock and had a collapsed lung. Because he could not breath on his own, the doctors attached him to a ventilator and regulated his breathing to ten breaths per minute. A neurosurgical operation screwed a "halo" into Pate's skull to support his severed spinal cord. He was attached to a feeding tube for both nutrition and medication.

## B. Awareness of Imminent Death

When Felicia Pate, Pate's mother, arrived at Shock Trauma, a doctor met with her in Pate's hospital room to discuss his condition. While Pate was lying in the bed next to where his mother was standing, the doctor told her that it was unlikely that her son would live more than 24 hours. The doctor told Ms. Pate that her son "wouldn't make it" and that he had

- 14 -

"never had a case that survived" the type of injuries that Pate had suffered. Ms. Pate testified

at the suppression hearing that when her son heard this, "tears came out of [his] eyes."

With respect to this critical precondition for an out-of-court assertion to qualify as a

dying declaration, the hearing judge made these specific findings of fact with respect to the

declarant's awareness of his imminent death:

> Pate believed he was going to die based upon statements made to him in front of his mother and his physical condition. The testimony of Pate's mother relative to tears in his eyes after doctors told him that he had 24 hours to live is extremely telling of Pate's resignation of his fate. ...
>
> ....
>
> The video taken at Shock Trauma shows an anxious young man completely dependent on machines. Pate in fact is being ventilated so that he receives 10 breaths per minute, a breath every 6 seconds. He was told several days before his statements to police officers that he should be dead. A person in this situation clearly would have the belief that death is imminent, close to certain. Pate sees police coming into the hospital room with evidence and a video camera to record these matters because the doctors, police, and hospital staff do not believe he will survive. In his situation, the court finds that Pate believed his death was imminent. The court finds that the statements are dying declarations.

(Emphasis supplied). Those findings of fact were not clearly erroneous.

## C. The Bedside Photographic Identification

On November 26, 2010, Prince George's County Detective Latasha Green visited the

Shock Trauma Unit to see if Pate could identify a picture of his shooter from a photographic

array. Just prior to the session, Nurse Keener had asked Pate a series of questions to

determine whether he was "alert and oriented." She determined that he was. Nurse Keener

- 15 -

later testified that blinking hard is a primary method of communication for patients who are unable to speak. She elaborated on how the technique works.

Detective Green showed Pate a series of six photographs and asked him to blink hard[3] if he saw a picture of the person who shot him. Pate blinked hard when he was shown the third picture in the photographic array but did not blink hard when shown any of the other five pictures. The third photograph was that of the appellee, Jermaine Hailes. The photographic array procedure was recorded on videotape and was entered into evidence at the suppression hearing.

The same identification procedure was used again the next day, November 27, 2010, when Prince George's County Police Corporal Everett showed Pate a different photographic array. Pate indicated, through hard blinking, yet an additional person who was involved in his shooting. That identification procedure was also videotaped and entered into evidence.

## D. Blinking As A Communicative Modality

Among the challenges raised by the appellee to his identification as the shooter was that Pate was incompetent as a witness because he lacked the ability to express himself. As the hearing judge properly ruled, however, Pate had the ability to express himself. He simply did it with blinks instead of with words. Again, that finding was not clearly erroneous.

---

[3]There is a discernible difference between a hard blink and a merely reflexive blink.

Although the use of the spoken word is a common communicative modality, it is by no means a unique one. Writing, of course, is a strong second. It is, moreover, almost universally recognized that a vertical shaking of the head means, "Yes"; a horizontal shaking of the head means, "No"; and the shrugging of the shoulders means, "I don't know." Many deaf persons, both in court and out, communicate with manual gestures rather than with spoken words. It is not at all unusual for an identification to be made, at a trial or at a hearing or at a police line-up, by pointing a finger or nodding the head. Let us not forget semaphore and Morse Code. Recent history has furnished dramatic examples of tortured American prisoners of war in North Korea or Viet Nam, while ostensibly confessing on videotape to some form of national guilt, relying on a combination of blinking and Morse Code to communicate a very different message.

The recognition of this common sense proposition is not new. See Simon Greenleaf, <u>Greenleaf on Evidence</u>, § 159b, "Declarations by Signs," pp. 250-51 (16th ed., Wigmore revision, 1899):

> The <u>testimony</u> here spoken of <u>may be given as well by signs as by words</u>; thus, <u>where one, being at the point of death</u> and conscious of her situation, <u>but unable to articulate by reason of the wounds she had received, was asked</u> to say whether the prisoner was the person who had inflicted the wounds, and, if so, <u>to squeeze the hand of the interrogator, and she thereupon squeezed his hand</u>, it was held that <u>this evidence was admissible and proper</u> for the consideration of the jury.

(Emphasis supplied).  See also Lester v. State, 76 So. 3d 952, 953 (Fla. Dist. Ct. App. 2011)

(blinking); Commonwealth v. Farrior, 458 A.2d 1356, 1359-60 (Pa. Super. Ct. 1983)

(nodding).

We fully agree with the very astute ruling in this regard by the suppression hearing

judge:

> Hailes argues that Pate is incompetent as he lacked the ability to express himself.  Maryland Rule 5-601 provides that "[e]xcept as otherwise provided by law, every person is competent to be a witness."
>
> A review of the videotape clearly shows Pate in distress, tied to a bed, restrained, with tubes of all types coming in and out of his body.  Pate communicates as best he can during the photo array.  A rational person can see that he understands the questions of the officers and on two occasions mouths certain statements that are relayed to all by an attending nurse.  While the method of communication is not the best and certainly not the preferred method; the State is correct that Pate is competent even if he must communicate through blinking.  While Maryland has not directly ruled on blinking as a form of communication by a witness; several of our sister states have ruled favorably to this form of testimony.  See Briones v. State, 2011 Ind. App. Unpub. LEXIS 500 (Ind. Ct. App. 2011); Lester v. State, 76 So. 3d 952, 954 (Fla. Dist. Ct. App. 2011).
>
> The Court recognizes the committee note for Maryland Rule 5-601 which states that "[a] court could find, however, that because of insufficient ... ability to express oneself ... a particular witness is not competent to testify as to certain matters."  Yet, with the legal presumption being that every witness is competent, the mere fact that Pate's ability to communicate is limited does not render him incompetent.  After review of the videotape and argument of counsel, it is clear to the court that Pate understood the questions asked and clearly communicated the answer the only way he could.  The trier of fact in this matter, a jury, could evaluate Pate's testimony and give the video clips of his statements the value and weight they find appropriate.  Therefore, with no facts to indicate otherwise the court finds that Pate was competent when these statements were made and his communication through blinking would be proper evidence in this criminal case.

- 18 -

(Emphasis supplied). The factfinding was not clearly erroneous and the legal ruling was not in error.

Should caselaw be needed for this proposition, we now hold that blinking is a legally acceptable mode of communication.

## E. Actual Time of Death Is Immaterial

Although it did not compromise his ultimate ruling that the November 26, 2010 photographic identification made by Melvin Pate was a dying declaration, the unusual lapse of time between the making of the dying declaration and the declarant's ultimate death did give the hearing judge some initial pause.

> The complicating facts in this case are that Pate was informed that he had 24 hours to live upon reaching Shock Trauma on November 24[th], and three days later on November 27th he is still alive, albeit connected to lifesaving equipment. He gives his statements in response to the photo array in his hospital room. Pate continued to live, and in fact leaves Shock Trauma in January of 2011. Pate is in and out of hospitals for almost two years until he finally dies on November 27, 2012 from the gunshot wounds sustained on November 22, 2010.
>
> Hailes argues that the subject statements were not made imminently close to death. The State counters that the time when Pate's statements are made is irrelevant.

(Emphasis supplied).

Such a lapse of time is, indeed, an unusual factual feature in Dying Declaration law, but it does not, as a legal matter, disqualify or compromise the admissibility of the Dying Declaration in any way. McLain, supra, makes it clear at § 804(2):1b, p. 767:

- 19 -

The statement [at the common law] was admissible only if the declarant actually died, although <u>the death need not have been almost immediate.</u>

(Emphasis supplied).

In 5 John Henry Wigmore, <u>Wigmore on Evidence</u>, at § 1441, "Speediness of Death,"

p. 295 (Chadbourn revision, 1974), it is stated:

<u>[T]he actual period of survival after making the declaration is immaterial.</u> The necessary element is a subjective one – the declarant's expectation; and <u>the subsequent duration of life, whatever it may turn out to be, has no relation to his state of mind when speaking</u> ....  Accordingly, <u>there seems to be no case in which the time of survival was deemed to exclude the declaration</u>; and various periods have been passed upon as not too long.

(Emphasis supplied).  Wigmore quotes with approval from C.B. Pollack in <u>Regina v. Reaney</u>, 7 Cox. Crim. Cas. 209, 212 (1857):

In truth, <u>the question does not depend upon the length of interval between the death and the declaration</u>, but on the state of the man's mind at the time of making the declaration and his belief that he is in a dying state.

(Emphasis supplied).

In 2 <u>McCormick on Evidence</u>, § 310, pp. 513-14 (7th ed. 2013), the same point is

made:

Even under the earlier formulations, <u>death was not required to have followed at any very short interval after the declaration.</u>  The critical issue throughout is the declarant's belief in the nearness of death at the time of the statement, <u>not the actual swiftness with which death ensues after the statement</u> or the immediacy of the statement after the injury.

(Emphasis supplied).

- 20 -

The older authorities were in full accord.  In 1 Simon Greenleaf, <u>Greenleaf on Evidence</u>, § 158 (15th ed. 1892), it is noted:

> <u>It is</u> the impression of almost immediate dissolution, and <u>not the rapid succession of death</u>, in point of fact, <u>that renders the testimony admissible.</u>

(Emphasis supplied).  See also <u>Mattox v. United States</u>, 146 U.S. 140, 151, 13 S. Ct. 50, 36 L. Ed. 917 (1892).  And see <u>Herrera v. State</u>, 682 S.W.2d 313, 320 (Tex. Crim. App. 1984) ("The length of time the declarant lives after making the dying declaration is immaterial."); <u>People v. Johnson</u>, 54 N.W.2d 206, 208 (Mich. 1952) ("That the declarant lived for several days after making the statement is not controlling" to a dying declaration analysis.); <u>State v. Gore</u>, 237 S.W. 993, 996 (Mo. 1922) ("The length of time which elapsed between the declaration and the death of the declarant furnishes no rule for the admission or rejection of the evidence.").

In any event, the bottom line finding of the suppression judge was that the photographic identification made by Melvin Pate qualified, in every one of its elements, as

a Dying Declaration.[4]  With that ruling, and with the companion ruling that Melvin Pate was

_____

[4]The appellee's characterization of the standard of appellate review is dangerously overbroad.  He states:

> Unlike other evidentiary rulings, a decision to admit or exclude evidence on the basis that it is hearsay is not reviewed for abuse of discretion. Instead, the question of whether evidence is hearsay is an <u>issue of law to be reviewed de novo</u> on appeal.

(Emphasis supplied).  In applying his proffered standard of review to the suppression hearing judge's finding that Melvin Pate made a dying declaration, the appellee goes on:

> As such, the trial court's determination that Mr. Pate made a statement while under a belief that his death was imminent is entitled to no deference.

That is absolutely incorrect.  Whether the Dying Declaration Exception to the Rule Against Hearsay is recognized in Maryland (an issue not in dispute in this case) is, to be sure, a question of law subject to the <u>de novo</u> standard of review.  Whether Melvin Pate believed that his death was imminent when he made his declaration is, on the other hand, a question of underlying fact subject to the "clearly erroneous" standard of review.  It is a finding of fact toward which we extend great deference.  The very thorough analysis by Judge Adkins in <u>Gordon v. State</u>, 431 Md. 527, 536-37, 66 A.3d 647 (2013), makes this very point when reviewing a trial judge's factfinding with respect to the emotional state of mind of a hearsay declarant.

> For instance, in determining whether evidence is admissible under the excited utterance exception to the hearsay rule, codified in Rule 5-803(b)(2), <u>the trial court looks into "the declarant's subjective state of mind" to determine whether "under all the circumstances, [he is] still excited or upset</u> to that degree." 6A Lynn McLain, <u>Maryland Practice: Maryland Evidence State & Federal</u> § 803(2):1(c) (2d ed. 2001).  It considers such factors, as, for example, how much time has passed since the event, whether the statement was spontaneous or prompted, and the nature of the statement, such as whether it was self-serving. <u>Id.</u>  <u>Such factual determinations require deference from appellate courts.</u>

(Emphasis supplied). The declarant's sense of the imminence of death in this case and the
(continued...)

a competent witness (more precisely, a competent declarant), we fully agree.

At this stage of our analysis, the dying declaration of Melvin Pate is in robust health.[5] It but remains to be seen what adverse impact, if any, it suffered as a result of Crawford v. Washington.

---

[4](...continued)
declarant's level of excitement in that case are indistinguishable. This was factfinding to which we defer.

[5]The reliability of this (or any other) dying declaration is not in dispute, and we are not at all certain what the appellee or the suppression court was even attempting to discuss in this regard. When we get to the second major issue in this case of identification, infra, reliability of a different variety will be discussed, but the reliability of an extrajudicial identification and the reliability of a hearsay declaration are different animals and have nothing in common. The reliability of a firmly-rooted hearsay exception is not even disputable. On this subject, Head v. State, 171 Md. App. 642, 663, 912 A.2d 1 (2006), quoted with approval from Chapman v. State, 331 Md. 448, 457, 628 A.2d 676 (1993):

> Where the hearsay in question falls within a "firmly rooted" hearsay exception "no independent inquiry into reliability is required..." "Admission under a firmly rooted hearsay exception satisfied the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements."

(Emphasis supplied). See also Gray v. State, 368 Md. 529, 570-71, 796 A.2d 697 (2002) ("No independent inquiry into reliability is required when evidence 'falls within a firmly rooted hearsay exception.'") (emphasis supplied). We discern no clearly expressed challenge in this regard, but for some reason the subject was being discussed.

## II.  The 18th Century Pedigree of the Dying Declaration

*What in the world should make me now deceive,*
*Since I must lose the use of all deceit?*
*Why should I then be false, since it is true*
*That I must die here and live hence by truth?*

... William Shakespeare,
King John, Act I, Scene IV.

It is not enough to know what a Dying Declaration is.  It behooves us to know when it came to be.  In addressing the next issue before us, the relationship between the Dying Declaration and the Confrontation Clause, it will be critically important to understand the status of the Dying Declaration in the years 1789 to 1791, from the passage by the first session of the first Congress in 1789 of a proposed Bill of Rights, including the Sixth Amendment's right to confrontation, to the ratification of the first ten amendments by nine necessary states as of December 15, 1791.

That period is dispositively important from an originalist point of view and the opinion of Justice Scalia for a unanimous Supreme Court in Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), is rife with originalism.  Whatever the Confrontation Clause meant vis-à-vis the Dying Declaration to the framers of 1789-1791 is precisely what it means today, and that will be our analytic starting point.  Should there be any ambiguity, moreover, about what Crawford said or what Crawford implied, reliance on the intention of the framers will be the tie-breaker.

Wigmore, supra, attributes the formal recognition of the Dying Declaration to the early 1700s, although the recognition of the animating principle has a much older pedigree. Wigmore cites, as did Simon Greenleaf before him, Shakespeare's History of King John from 1595 as well as the 1603 trial of Sir Walter Raleigh for treason.[6] In § 1430, p. 275, Wigmore states:

> § 1430. History; early statutes. This exception, as such, dates back as far as the first half of the 1700s – the period when the hearsay rule was coming to be systematically and strictly enforced (§ 1364, supra) and at the same time certain excepted cases were coming to be recognized and defined. The ruling of Lord Mansfield in Wright v. Littler, in 1761 (§ 1431 infra), is generally taken as the leading early case, though the notion that special trust may be reposed in deathbed statements was already long understood.

(Emphasis supplied). In § 1438, p. 289, Wigmore further explained:

> All courts have agreed, with more or less difference of language, that the approach of death produces a state of mind in which the utterances of the dying person are to be taken as free from all ordinary motives to misstate. The great dramatist expressed the common feeling long before it was sanctioned by judicial opinion.

(Emphasis supplied).

Wigmore cites as a key early precedent the opinion of Chief Baron Eyre in Rex v. Woodcock, 1 Leach 500, 168 Eng. Rep. 352 (K.B. 1789), in which Baron Eyre described the rationale of the Dying Declaration:

> Now, the general principle on which this species of evidence is admitted is, that they are declarations made in extremity, when the party is at

---

[6]The 10th (1858) edition of Greenleaf on Evidence, § 156, p. 225 n.1, traced the Dying Declaration principle to a canon of Roman Civil Law.

the point of death, and when every hope of this world is gone; <u>when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth</u>; a situation so solemn, and so awful, is considered by the law as <u>creating an obligation equal to that which is created by a positive oath administered in a Court of Justice.</u>

(Emphasis supplied).

In <u>McCormick</u>, <u>supra</u>, § 309, pp. 507-08, the authors go straight from the early origins of the Dying Declaration rule to the point now before us.

> Of the doctrines that authorize the admission of special classes of hearsay, the doctrine relating to dying declarations is the most mystical in its theory and traditionally among the most arbitrary in its limitations. <u>The notion of the special likelihood of truthfulness of deathbed statements was widespread long before the recognition of a general rule against hearsay in the early 1700s.</u> Not surprisingly, <u>nearly as soon as we find a hearsay rule, we also find an exception for dying declarations. The fact that dying declarations were received at the time the Constitution and the Bill of Rights were formed</u> when the hearsay rule was not yet settled <u>led the Supreme Court</u> in <u>Crawford v. Washington</u> to suggest that even if such a statement is testimonial it would be admissible as an exception to the Confrontation Clause objection.

(Emphasis supplied).

In Peter Nicholas, "'I'm Dying to Tell You What Happened': The Admissibility of Testimonial Dying Declarations Post-<u>Crawford</u>," 37 <u>Hastings Const. L.Q.</u> 487, 495-96 (2010), Dean Nicholas describes three early English cases where Dying Declarations were held to be admissible notwithstanding circumstances that clearly made them, in modern terms, testimonial rather than non-testimonial.

> [I]n the 1722 trial of Hugh Reason [<u>Rex v. Reason</u>, 93 Eng. Rep. 659, 659-60 (K.B. 1722)] (cited in <u>Monterrosso</u>), the court held admissible the victim's dying declaration, even though it was given under oath in the presence of two justices of the peace and reduced to writing. Second, in the 1752 trial of

- 26 -

James MacGregor and the 1753 trial of Robert MacGregor, the court held admissible the dying declaration of the victim even though it was given in the presence of two Judges, who took it down in writing [See 2 David Hume, Commentaries on the Law of Scotland Respecting Trial for Crimes 229 (1800)]. Third, in the 1789 trial of William Woodcock (cited in Crawford) – in a case that has been described as providing the "classic statement" of the dying declaration hearsay exception – the court held admissible the victim's dying declaration despite the fact that it was made under oath to a magistrate and reduced to writing.

Tim Donaldson and J. Preston Frederickson, "Dying to Testify?  Confrontation vs. Declaration In Extremis," 22 Regent U. L. Rev. 35, 46-55 (2010), surveys a large number of English cases concerning the admissibility of Dying Declarations and notes specifically, at 52-53:

> The cases leading up to, and including, [Wright v. Little, 96 Eng. Rep. 192 (K.B. 1761),] demonstrate that it had become common practice to admit dying declarations as evidence, but in light of repeated admonitions in Blackstone's report that the case was limited to its facts, it is debatable whether the relationship between the hearsay and dying declaration rules had been settled.  Yet, a rapid reconciliation took place over the next few decades.  The 1768 edition of Blackstone's Commentaries stated that in some cases, "the courts admit ... hearsay evidence, or an account of what persons deceased have declared in their life-time: but such evidence will not be received of any particular facts."  By the time the 1794 edition was published, it had been resolved that the dying declaration rule had survived the emergence of the prohibition against hearsay, and the earlier passage from Blackstone's Commentaries included a footnote that confirmed the following:
>
> > In criminal cases, the declarations of a person, who relates in extremis, or under an apprehension of dying, the cause of his death, or any other material circumstance, may be admitted in evidence; for the mind in that awful state is presumed to be as great a religious obligation to disclose the truth, as is created by the administration of an oath.

- 27 -

As early as 1892, the Supreme Court showed that it was familiar with the evidentiary phenomenon of the Dying Declaration. On December 12, 1889, 19-year-old Clyde Mattox, while drunk, shot and killed John Mullen in the Indian Territory (since 1907, the State of Oklahoma). At his trial in a federal court in Wichita, Kansas, a jury found him guilty of murder and he was sentenced to be hanged. The Supreme Court ultimately reversed his conviction in Mattox v. United States, 146 U.S. 140, 13 S. Ct. 50, 36 L. Ed. 917 (1892), on two grounds, one of which was jury tampering. The other was the erroneous ruling that a question put by defense counsel that, if allowed, could have elicited a dying declaration, was inadmissible. Mattox's mother was asked whether Mullen, while in extremis, had said to her:

> I know Clyde Mattox, your son, and he was not one of the parties who shot me.[7]

In reversing the conviction on the ground that Mattox should have been allowed to explore the possibility of a Dying Declaration, the Court, 146 U.S. at 151-52, discussed the Dying Declaration:

> Dying declarations are admissible on a trial for murder, as to the fact of the homicide and the person by whom it was committed, in favor of the defendant as well as against him. But it must be shown by the party offering them in evidence that they were made under a sense of impending death. This may be made to appear from what the injured person said; or from the nature

---

[7]Yes, a Dying Declaration can be exculpatory as well as inculpatory. An exculpatory Dying Declaration, of course, could never raise any Confrontation Clause problems because it is only the "accused" who enjoys any Sixth Amendment right to confront the witnesses against him.

and extent of the wounds inflicted being obviously such that he must have felt or known that he could not survive; as well as from his conduct at the time and the communications, if any, made to him by his medical advisers, if assented to or understandingly acquiesced in by him. ... <u>The admission of the testimony is justified upon the ground of necessity, and in view of the consideration that the certain expectation of almost immediate death will remove all temptation to falsehood and enforce as strict adherence to the truth as the obligation of an oath could impose.</u>

(Emphasis supplied).

At Mattox's retrial in Wichita, he was again convicted and sentenced to be hanged. On his second visit to the Supreme Court, his conviction was affirmed. <u>Mattox v. United States</u>, 156 U.S. 237, 15 S. Ct. 337, 39 L. Ed. 409 (1895). On an issue other than Dying Declarations, the Court had an occasion to discuss generally the importance of original intent in resolving constitutional issues:

> <u>We are bound to interpret the constitution in the light of the law as it existed at the time it was adopted</u>, not as reaching out for new guaranties of the rights of the citizen, but <u>as securing to every individual such as he already possessed as a British subject</u>, – such as his ancestors had inherited and defended since the days of Magna Charta. <u>Many of its provisions in the nature of a bill of rights are subject to exceptions, recognized long before the adoption of the constitution</u>, and not interfering at all with its spirit. Such exceptions were obviously intended to be respected. A technical adherence to the letter of a constitutional provision may occasionally be carried further than is necessary to the just protection of the accused, and further than the safety of the public will warrant.

156 U.S. at 243 (emphasis supplied). The Court then seized upon the subject of the Dying Declaration simply as an example in the course of making its general argument with respect to original intent.

For instance, <u>there could be nothing more directly contrary to the letter of the provision in question than the admission of dying declarations.</u> They are rarely made in the presence of the accused; <u>they are made without any opportunity for examination or cross-examination</u>, nor is the witness brought face to face with the jury; <u>yet from time immemorial they have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility.  They are admitted, not in conformity with any general rule regarding the admission of testimony, but as an exception to such rules</u>[.]

156 U.S. at 243-44 (emphasis supplied).[8]

In any event, the Dying Declaration was a well-settled and universally accepted principle of Anglo-American law as of the proposal and ratification of the Confrontation Clause in 1789-91.  Even as the Supreme Court in <u>Pointer v. Texas</u>, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965), first held that the Confrontation Clause was part of Fourteenth Amendment Due Process and, therefore, applicable to the states, it squarely maintained:

> This Court has recognized the admissibility against an accused of dying declarations ... Nothing we hold here is to the contrary.

380 U.S. at 407.

---

[8]Following his return to Wichita, Mattox broke out of jail but was subsequently recaptured and sent to the federal penitentiary at Leavenworth.  While there, his sentence was commuted from death to life imprisonment by President Grover Cleveland.  On January 15, 1898, moreover, Mattox was given a full pardon by President William McKinley.  On April 3, 1899, however, in Ponca City, Indian Territory (Oklahoma), Mattox killed a rancher in a barroom quarrel.  After exchanging shots with several pursuing posses, Mattox escaped the territory.  He was subsequently arrested in Los Angeles, California, on July 20, 1899, living under an assumed name.  At that point, the trail runs cold.

### III. The Dying Declaration and the Confrontation Clause

Crawford v. Washington was a dramatic reinterpretation of the Confrontation Clause. The Court eschewed its comfortable accommodation with hearsay law as exemplified by Ohio v. Roberts, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). It overruled Ohio v. Roberts and rigidly insisted on a prior opportunity for the cross-examination of all out-of-court declarations that were "testimonial" in nature.

The reasoning of the Supreme Court, as explained by Justice Scalia, was one firmly rooted in history.

> The Constitution's text does not alone resolve this case. ... We must therefore turn to the historical background of the Clause to understand its meaning.

541 U.S. at 42-43. It is history that dictates the original and now freshly rediscovered meaning of confrontation. It is that same history that dictates such exemptions from the rule of confrontation as 1) forfeiture by wrongdoing and 2) the Dying Declaration.

The Crawford opinion goes on for fourteen pages in the United States Reports, 541 U.S. at 43-56, to examine in meticulous detail the state of Anglo-American common law, looking at English decisions and American colonial decisions alike. The ultimate touchstone, both for the meaning of confrontation and for exceptions to the confrontation requirement, was the state of the common law in 1791. This was the law accepted and understood by the framers.

> The text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts. Rather, the

- 31 -

"right ... to be confronted with the witnesses against him," is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding. As the English authorities above reveal, the common law in 1791 conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine. The Sixth Amendment therefore incorporates those limitations.

541 U.S. at 54 (emphasis supplied).

In terms of its adherence to the original understanding of a constitutional provision, Crawford affirmed that earlier Supreme Court decisions have generally "been faithful to the original meaning" but acknowledged that the rationales have sometimes wavered. It criticized Ohio v. Roberts for "depart[ing] from the historic principles."

Although the results of our decisions have generally been faithful to the original meaning of the Confrontation Clause, the same cannot be said of our rationales. Roberts conditions the admissibility of all hearsay evidence on whether it falls under a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." This test departs from the historical principles identified above ...

Members of this Court and academics have suggested that we revise our doctrine to reflect more accurately the original understanding of the Clause.

541 U.S. at 60 (emphasis supplied).

One of the historic exemptions from the Confrontation Clause has been the principle of forfeiture by wrongdoing. Crawford, 541 U.S. at 62, recognized that exemption.

[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation on essentially equitable grounds; it does not purport to be an alternative means of determining reliability. See Reynolds v. United States, 98 U.S. 145, 158-59, 25 L. Ed. 244 (1879).

- 32 -

(Emphasis supplied).  See also <u>Smiley v. State</u>, 216 Md. App. 1, 84 A.3d 190 (2014), <u>cert. granted</u>, ___ Md. ___ (April 18, 2014).

The other historic exemption from the Confrontation Clause is the Dying Declaration. Although <u>Crawford</u> did not issue a square holding in that regard, because no issue involving a Dying Declaration was before the Court, it indicated that if the Dying Declaration is accepted as an exception to the Confrontation Clause "on historic grounds," it "is <u>sui generis</u>."

> <u>The one deviation we have found involves dying declarations.</u>  <u>The existence of that exception</u> as a general rule of criminal hearsay law <u>cannot be disputed.</u> See, e.g., <u>Mattox v. United States</u>, 156 U.S. 237, 243-44, 15 S. Ct. 337, 39 L. Ed. 409 (1895); <u>King v. Reason</u>, 16 How. St. Tr. 1, 24-38 (K.B.1722); 1 D. Jardine, Criminal Trials 435 (1832); Cooley, Constitutional Limitations, at *318; 1 G. Gilbert, Evidence 211 (C. Lofft ed. 1791); see also <u>F. Heller</u>, The Sixth Amendment 105 (1951) (<u>asserting that this was the only recognized criminal hearsay exception at common law</u>).  <u>Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are.</u>  See <u>Woodcock</u>, <u>supra</u>, at 501-04, 168 Eng. Rep., at 353-54; <u>Reason</u>, <u>supra</u>, at 24-38; <u>Peake</u>, <u>supra</u>, at 64; cf. <u>Radbourne</u>, <u>supra</u>, at 460-62, 168 Eng. Rep., at 332-33.  We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations.  <u>If this exception must be accepted on historical grounds</u>, it is <u>sui generis</u>.

541 U.S. at 56 n.6 (emphasis supplied).

If the Supreme Court's recognition of the Dying Declaration as an exemption from the Confrontation Clause was at all uncertain in <u>Crawford</u>, the recognition was stated far more affirmatively in <u>Giles v. California</u>, 554 U.S. 353, 358-59, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008), a decision also written by Justice Scalia:

We have previously acknowledged that two forms of testimonial statements were admitted at common law even though they were unconfronted.  The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying. ...

A second common-law doctrine, which we will refer to as forfeiture by wrongdoing, permitted the introduction of statements of a witness who was "detained" or "kept away" by the "means or procurement" of the defendant.

(Emphasis supplied).

In analyzing one of the elements of a forfeiture by wrongdoing, the Supreme Court in <u>Giles</u> used the Dying Declaration as the touchstone for admissibility at the common law.

Aside from testimony given at trial in the presence of the prisoner, the judge said, there were "two other species which are admitted by law: The one is the dying declaration of a person who has received a fatal blow; the other is the examination of a prisoner, and the depositions of the witnesses who may be produced against him" taken under the Marian bail and committal statutes. ... Thus, the statements were admissible only if the witness "apprehended that she was in such a state of mortality as would inevitably oblige her soon to answer before her Maker for the truth or falsehood of her assertions."

554 U.S. at 362 (emphasis supplied).[9]  The Supreme Court opinion also referred to the old

English case of <u>Rex v. Dingler</u>, 2 Leach 561, 168 Eng. Rep. 383 (1791), as an instance

where several out-of-court declarations were not accepted because they "did not qualify as

dying declarations."  554 U.S. at 363.

Sixteen of our sister states have considered whether the Dying Declaration is

exempted from the coverage of the Confrontation Clause.  Sixteen out of sixteen have

concluded that it is.  In <u>People v. Monterroso</u>, 34 Cal. 4th 743, 765, 101 P.3d 956, 972

(2004), the California Supreme Court addressed the issue squarely:

> Thus, if, as <u>Crawford</u> teaches, the confrontation clause "is most naturally read
> as a reference to the right of confrontation at common law, admitting only
> those exceptions established at the time of the founding," it follows that <u>the
> common law pedigree of the exception for dying declarations poses no
> conflict with the Sixth Amendment.</u>

---

[9]Richard D. Friedman, "The Confrontation Clause Re-Rooted and Transformed,"
2004 <u>Sup. Ct. Rev.</u> 439, 464, 466-67, argues that the exemption of the Dying Declaration
from the Confrontation Clause could be more readily understood if we conceptualized it as
an instance of the other and undisputed exemption from the Confrontation Clause –
Forfeiture by Wrongdoing.  Professor Friedman states, "The idea that the accused cannot
claim the confrontation right if the accused's own misconduct prevents the witness from
testifying at trial is a very old one. ... The admissibility of dying declarations ... is best
understood as a reflection of the principle that a defendant who renders a witness
unavailable by wrongful means cannot complain about her absence at trial."  See also
Richard D. Friedman, "Confrontation: The Search for Basic Principles," 86 <u>Geo. L.J.</u> 1011
(1998).  And see <u>State v. Oliver</u>, 7 Del. (2 Houst.) 585, 589 (Del. Super. Ct. 1863).  <u>Giles
v. California</u> foreclosed the Friedman option of combining the two exemptions from the
Confrontation Clause into one, but the discussion does illustrate that the Dying Declaration
may analytically be in a different category than the other firmly rooted exceptions to the
Hearsay Rule.

(Emphasis supplied). See also Walton v. State, 278 Ga. 432, 603 S.E.2d 263, 265-66 (2004); People v. Gilmore, 356 Ill. App. 3d 1023, 828 N.E.2d 293, 302 (2005) ("Although the statement just quoted [from Crawford] is dicta, we view it as a strong indication that the Court does not believe that admitting testimonial dying declarations violates the confrontation clause."); Wallace v. State, 836 N.E.2d 985, 996 (Ind. 2005) ("[W]e are convinced that Crawford neither explicitly, nor implicitly, signaled that the dying declaration exception to hearsay ran afoul of an accused's right of confrontation under the Sixth Amendment."); State v. Jones, 197 P.3d 815, 822 (Kan. 2008) ("Accordingly, we are confident that, when given the opportunity to do so, the Supreme Court would affirm that a dying declaration may be admitted into evidence, even when it is testimonial in nature and is unconfronted."); Commonwealth v. Nesbitt, 452 Mass. 236, 892 N.E.2d 299, 310-11 (2008) ("Thus, in the unique instance of dying declarations, we ask only whether the statement is admissible as a common-law dying declaration, and not whether the statement is testimonial."); People v. Taylor, 275 Mich. App. 177, 737 N.W.2d 790, 795 (2007) ("For the reasons stated by the Supreme Court of California, we hold that, under Crawford, dying declarations are admissible as an historic exception to the Confrontation Clause."); State v. Martin, 695 N.W.2d 578, 585-86 (Minn. 2005) ("We hold that the admission into evidence of a dying declaration does not violate a defendant's Sixth Amendment right to confrontation within the meaning of Crawford because an exception for dying declarations existed at common law and was not repudiated by the Sixth Amendment."); Grindle v. State, 134 So.

3d 330, 341-44 (Miss. App. 2013) ("[W]e are swayed by the United States Supreme Court's commentary in <u>Crawford</u> and <u>Giles</u> that, were the matter properly before the Court, the exception would be held to apply."); <u>Harkins v. State</u>, 143 P.3d 706, 711 (Nev. 2006) ("The Confrontation Clause, like other provisions in the Bill of Rights, is subject to exceptions, 'recognized long before the adoption of the Constitution, and not interfering at all with its spirit.' A dying declaration is one such exception to the Confrontation Clause."); <u>People v. Clay</u>, 88 A.D.3d 14, 26-27 (N.Y. App. Div. 2011) ("Thus, we read <u>Crawford</u> to signify that the substance of the right of confrontation enshrined in the Constitution is informed by the contemporaneous understanding of that right at common law, and is not, instead, an abrogation of it. We therefore conclude that the Supreme Court, having suggested that the common-law right did not encompass dying declarations, would likely determine that the same is true of the Sixth Amendment."); <u>State v. Calhoun</u>, 189 N.C. App. 166, 657 S.E.2d 424, 428 (2008) ("We ... follow the majority of the states that have decided this issue and hold that a dying declaration is a 'special exception' under <u>Crawford</u> to the Sixth Amendment right to confrontation."); <u>State v. Kennedy</u>, 998 N.E.2d 1189, 1202 (Ohio Ct. App. 2013) ("In light of this case law, we hold that the Sixth Amendment incorporates an exception for 'the common law pedigree' of dying declarations, even testimonial ones, and that <u>Crawford</u> did not alter the rule."); <u>State v. Lewis</u>, 235 S.W.3d 136, 148 (Tenn. 2007) ("Because the admissibility of the dying declaration is also deeply entrenched in the legal history of this state, it is also our view that the single hearsay exception survives the mandate

- 37 -

of Crawford regardless of its testimonial nature."); Satterwhite v. Commonwealth, 695 S.E.2d 555, 560-62 (Va. Ct. App. 2010) ("[W]e hold Crawford did not upend the traditional view that dying declarations serve as an exception both to the common law hearsay rule and the constitutional right of a defendant to confront his accusers."); State v. Beauchamp, 796 N.W.2d 780, 784-85 (Wis. 2011) ("Those principles compel the conclusion that allowing this hearsay exception comports with the protections of the Confrontation Clause."). Contra United States v. Mayhew, 380 F. Supp. 2d 961, 964-65 (S.D. Ohio 2005) (Mayhew admitted the dying declaration but rationalized the exemption from the Confrontation Clause as an instance of forfeiture by wrongdoing.).

The academic authorities are in solid accord. McCormick on Evidence, supra, § 309, pp. 507-08, stated:

> The fact that dying declarations were received at the time the Constitution and the Bill of Rights were formed when the hearsay rule was not yet settled led the Supreme Court in Crawford v. Washington to suggest that even if such a statement is testimonial it would be admissible as an exception to the Confrontation Clause objection.

(Emphasis supplied).

McLain, Maryland Evidence, supra, observed at § 804(3):1b, p. 771:

> In Crawford v. Washington the U.S. Supreme Court opined that although some dying declarations might be "testimonial" for purposes of the confrontation clause, they would nonetheless be admissible against a criminal accused.

(Emphasis supplied).

Professor Nicholas, supra, at 37 Hastings Const. L.Q. 491-92, observed in that regard:

- 38 -

In footnote six, the Court took pains to point out that <u>Crawford</u> did not technically decide the issue of the admissibility of dying declarations vis-à-vis the Confrontation Clause. But if the post-<u>Crawford</u> era to date is any guide, <u>this dictum will, like other dicta in Crawford, soon become the Law of the Land.</u> ... In any event, <u>the Court's holding in Giles v. California four years later effectively assumes that a dying declaration exception to the Confrontation Clause exists.</u> Moreover, lower federal courts and state courts that have addressed the issue have, with near unanimity, read footnote six of <u>Crawford</u> as creating a dying declaration exception to the Confrontation Clause.

(Emphasis supplied).

Professors Donaldson and Frederickson, <u>supra</u>, at 22 <u>Regent U. L. Rev.</u> 77, have also

noted:

<u>Crawford</u> acknowledged the existence of authority for admitting testimonial dying declarations. <u>The Supreme Court left no doubt in Giles about its understanding of the status of the dying declaration exception</u> at the time of founding when it confirmed: "We have previously acknowledged that <u>two forms of testimonial statements were admitted at common law even though they were unconfronted</u> ... <u>The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying.</u>" There is no foundation for the assertion that the dying declaration exception was nonexistent at the time that the Bill of Rights was designed.

... Whatever construction a court places on the Confrontation Clause, it is irrefutable that dying declarations were admitted at common law before and after ratification of the Bill of Rights. <u>If something must yield when reconciling theory and history in this area, the permanence of history should withstand the winds of changing thought.</u>

(Emphasis supplied).

- 39 -

This juggernaut of persuasive authority is irresistible. Maryland hereby joins the ranks.[10] We hold that the Dying Declaration, like Forfeiture by Wrongdoing, is exempted from the coverage of the Confrontation Clause.[11] This holding is the linchpin of this opinion and everything else revolves around it. Let our holding be carefully noted. We are not holding that all of Maryland's current version of the Dying Declaration, as defined by

---

[10] In Head v. State, 171 Md. App. 642, 661 n.10, 912 A.2d 1 (2006), the possible impact of Crawford on the Dying Declaration was alluded to in a footnote, but the Court found it "unnecessary for us to decide the issue." In Head, an out-of-court declaration was admitted in evidence, the trial court having ruled that it qualified both as a dying declaration and as an excited utterance.

The total focus of the very thorough and scholarly opinion by Judge Salmon, however, was on Crawford's distinction between testimonial and non-testimonial statements. The statement in Head was held to be admissible because, even if the Confrontation Clause, arguendo, applied, it would not have been violated because the statement in issue was non-testimonial. The Head Court did not consider the threshold question of whether the Confrontation Clause applied to Dying Declarations.

[11] Ironically, an answer simply begets new questions. If, indeed, the Supreme Court has exempted the Dying Declaration from the coverage of the Confrontation Clause, it has not yet mapped out the precise contours of the Dying Declaration that enjoys the exemption. Because Crawford's originalism is deeply rooted in history, it is overwhelmingly probable that the object of the exemption will be the common law Dying Declaration as it was understood to be in 1791. By rule and statute, however, many states (including Maryland) have, in varying degrees, expanded the coverage of the Dying Declaration.

Is there not then the fascinatingly nuanced possibility that the core content of the Dying Declaration is exempt from the Confrontation Clause but the more peripheral and expanded coverage is not? In the present case, for instance, is there a possibility that the Dying Declaration might be exempt from Confrontation Clause problems on the murder charge, but might not be so exempt on a charge such as conspiracy to murder even if such a charge were deemed to be within the expanded definition of Maryland Rule 5-804(b)(2)? Of the subtle follow-up issues that may surface in the wake of Crawford v. Washington, Donaldson and Frederickson, "Dying to Testify," supra, provides a thorough and tantalizing analysis.

Maryland Rule 5-804(b)(2), is necessarily exempted from the coverage of the Confrontation Clause. All that is necessary for us to hold, using Crawford's originalist analysis, is that the common law core content of the Dying Declaration as it was understood in 1791 is exempted from the coverage of the Confrontation Clause. We are not deciding anything beyond that.

### The Attack On Originalism Is A Two-Edged Sword

In an effort to discredit the Dying Declaration as an historically established exception to the right of confrontation, the appellee at oral argument disparaged the value of originalism and urged us to reject it as a valid mode of constitutional interpretation. That argument produces a delightful paradox. The appellee may have a plausible criticism of originalism generally, but he can hardly make it in the context of this case. The originalist approach to constitutional interpretation is the sine qua non for the very existence of Crawford v. Washington and the reinterpretation of the Confrontation Clause that he necessarily embraces on this appeal. It ill behooves him to exalt a mode of analysis when it serves his purpose, but then reject it when it does not. Consistency should be made of stronger stuff, and he must take the mode of analysis that produced Crawford for better or for worse.

If the undergirding rule of Crawford v. Washington, based as it is on the originalist school of constitutional interpretation, is valid, so too is the Dying Declaration exception to that rule, based on precisely the same history-based mode of analysis. The rationales for

both the rule and the exception to the rule rise or fall together. A rejection of <u>Crawford v. Washington</u> would throw the law back on <u>Ohio v. Roberts</u>, whereunder the Dying Declaration, as a firmly-rooted hearsay exception, would, of course, pass constitutional muster with flying colors. To kill the exception, the appellee would have to kill the underlying rule to which it is an exception. That would be fatally counterproductive.

## IV. The Confrontation Clause Inapplicable

At this point, our analysis of the major issue before us (we have yet to consider, more briefly, the identification challenge) is completed. Lest it appear, however, that we are cavalierly ignoring half of the decision rendered at the suppression hearing and half of the issues briefed and argued by the appellee, we should explain briefly why our analysis is now complete.

We have determined, and so hold, that, under <u>Crawford</u>, the Confrontation Clause of the Sixth Amendment does not cover the dying declaration in this case. Critical to an understanding of our holding is that the admissibility of the Dying Declaration is not an instance of the Confrontation Clause Satisfied. By way of dramatic contrast, it is an instance of the Confrontation Clause Inapplicable.

If our holding were, indeed, an instance of the Confrontation Clause Satisfied, we could not have rendered it until we had considered and deemed satisfied the various sub-issues that we shall, instead, ignore. When dealing, by contrast, with an instance of the Confrontation Clause Inapplicable, we are, by definition, blithely indifferent to the

requirements of the Confrontation Clause. Where it does not apply, it cannot be violated, just as it cannot be satisfied. Its requirements are a matter of utter immateriality. The dying declaration in this case no more has to satisfy the Confrontation Clause than it has to satisfy the Rule in Shelley's Case or the prohibition against Cruel and Unusual Punishment. For present purposes, the Confrontation Clause is meaningless.

**Immateriality No. 1: "Testimonial" versus "Nontestimonial"**

Much of the controversy in this case swirled about the question of whether Melvin Pate's dying declaration was "testimonial" or "nontestimonial" in nature. Indeed, almost one-third of the appellee's brief has been devoted to the issue. If the Confrontation Clause applied, that would, of course, be a necessary issue for resolution. The Confrontation Clause, after all, covers testimonial declarations but does not cover nontestimonial ones. The testimonial versus nontestimonial dichotomy is a pivotal device in fine-tuning Confrontation Clause coverage. Where there is general or blanket non-coverage, on the other hand, the fine-tuning is meaningless. You cannot fine-tune non-coverage.

If in a given case, such as <u>Head v. State</u>, 171 Md. App. 642, 912 A.2d 1 (2006), for instance, the reviewing court opted to treat the Confrontation Clause as if, <u>arguendo</u>, it did apply to a Dying Declaration but nonetheless was not violated because the declaration in question was nontestimonial, there was no need to resolve the threshold question of applicability. The State wins if, even if it does apply, the Confrontation Clause is not violated. Alternatively, the State wins if the Confrontation Clause does not apply. The State

does not have to win both ways. The hypothetical consideration by a reviewing court of the satisfaction question by no means implies a sub silentio holding that the Confrontation Clause necessarily does apply. It is rather the case that the issue of threshold applicability is finessed because it is unnecessary to decide it. The suppression court's decision in this case, however, seemed to treat Head v. State as if it had decided the threshold issue. It did not.

Some Dying Declarations are testimonial in nature; others are nontestimonial. For the common law Dying Declaration, however, it does not make any difference. The Dying Declaration is not covered by the Confrontation Clause whether it is testimonial or nontestimonial. All of the discussion in this case on "testimonial" versus "nontestimonial" has no bearing on the case's outcome. On this issue of "testimonial" versus "non-testimonial," we are politely tuning out.

**Immateriality No. 2: "Primary Purpose"**

By the time we get to Michigan v. Bryant, 562 U.S. ___, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011), and the question of the "primary purpose" of the declaration, it becomes a matter of immateriality squared. The next big confrontation case after Crawford was the combined case of Davis v. Washington and Hammon v. Indiana, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). It explored at length the dichotomy between "testimonial" and "nontestimonial" statements, as it contrasted the "nontestimonial" non-coverage of the Confrontation Clause in Davis with the "testimonial" coverage in Hammon. That

testimonial versus nontestimonial dichotomy is the primary and indispensable coverage criterion for the Confrontation Clause.

A secondary aspect of the fine-tuning appeared in Michigan v. Bryant. In order to determine whether the out-of-court statement in issue is, indeed, testimonial, a further inquiry undertakes an examination of whether the statement's "primary purpose is to enable police assistance to meet an ongoing emergency" (nontestimonial) or whether its "primary purpose is to establish or prove past events potentially relevant to later criminal prosecution" (testimonial). If Davis v. Washington was a fine-tuning of Crawford, Michigan v. Bryant was a fine-tuning of the fine-tuning. In probing for a statement's "primary purpose," moreover, the Michigan v. Bryant majority opinion ultimately explored such tertiary considerations as 1) the ongoing nature of the emergency and 2) the level of formality or informality of the statement in issue. They may be thought of as fine-tuning cubed.

The excellent and scholarly opinion of the suppression hearing court in this case was a meticulously thorough analysis of why Melvin Pate's dying declaration would have been testimonial in nature if the Confrontation Clause actually applied to Dying Declarations. In microcosm, we would agree. Our difference with the suppression court, however, is in macrocosm. Because of our threshold determination that Crawford does not apply to Dying Declarations, the entire testimonial versus nontestimonial issue becomes immaterial. A fortiori, Michigan v. Bryant's sub-criteria for analyzing the testimonial issue are equally immaterial.

Bryant, in any event, was not a Dying Declaration case. It was an exhaustingly thorough examination of the testimonial versus nontestimonial dichotomy for determining Confrontation Clause coverage. It articulated for the first time detailed criteria for determining what is testimonial and what is not. The critical events in Bryant, moreover, took place before Crawford v. Washington had been decided. The Michigan Supreme Court did not consider the Dying Declaration issue because it held that it had not been preserved for appellate review. The Supreme Court, 131 S. Ct. at 1151 n.1, similarly declined to consider the threshold question of whether the Dying Declaration was covered by the Confrontation Clause.

> We noted in Crawford that we "need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations." Because of the State's failure to preserve its argument with regard to dying declarations, we similarly need not decide that question here.

Bryant, therefore, tells us absolutely nothing about the threshold issue of the Confrontation Clause's coverage of the Dying Declaration.[12] With respect to Michigan v.

_____

[12]Justice Ginsburg in her brief dissent, 131 S. Ct. at 1177, mentioned the Dying Declaration and indicated that for her it was still an open question as to whether the exception had survived "recent Confrontation Clause decisions."

> In Crawford v. Washington, this Court noted that, in the law we inherited from England, there was a well-established exception to the confrontation requirement: The cloak protecting the accused against admission of out-of-court testimonial statements was removed for dying declarations. This historic exception, we recalled in Giles v. California, applied to statements made by a person about to die and aware that death was imminent. Were the issue properly tendered here, I would take up the question whether the
>
> (continued...)

- 46 -

<u>Bryant</u>, with respect to the primary purpose of the Dying Declaration, the ongoing nature of the emergency, and the level of formality of the Dying Declaration, we are similarly tuning out.

**Immateriality No. 3: Utterances, Excited and Unexcited**

The suppression hearing court found and ruled that Melvin Pate's photographic identification was not an excited utterance. With that finding we have no quarrel. It was not a clearly erroneous finding; it did not constitute an abuse of discretion; and we would almost certainly defer to it, if it mattered. It does not.

If the photographic identification qualifies as an admissible dying declaration (and we hold that it does), that is dispositive of the appeal. Whether the declaration might qualify under a second firmly rooted exception is immaterial. For a Dying Declaration itself, the excitement or complete lack of excitement on the part of the declarant is not in any way a factor.

It would not serve the State's cause in this case, moreover, even if the photographic identification had been an Excited Utterance. The Excited Utterance, unlike the Dying Declaration, was not even arguably exempted by <u>Crawford</u> from the coverage of the Confrontation Clause, and that hurdle would be fatal to the utterance in any event. The Excited Utterance issue is a tangent that goes nowhere.

---

[12](...continued)
exception for dying declarations survives our recent Confrontation Clause decisions.

**Immateriality No. 4: Other Reliability Factors**

The hearing court found that the photographic identification lacked sufficient guarantees of reliability to qualify as admissible evidence. The court's discussion of reliability, however, clearly comes across as simply another aspect of the court's consideration of the confrontation issue, as it "viewed the actions of Detectives Green and Everett" and rued the inability of defense counsel to cross-examine them.

> These factors are important for the trier of fact to assess the reliability of the identification. Typically, they can be elicited through examination by the state or through cross examination by the defense. This case lacks the critical element of how Pate viewed his shooter. The inability of Hailes's defense team to explore Pate's viewing and recollection of the shooting runs afoul of Hailes's Sixth Amendment right of confrontation.

(Emphasis supplied).

We have already disposed of that confrontation issue. In terms of the legally required reliability of a Dying Declaration in and of itself, its very qualification as a Dying Declaration (as the hearing judge ruled it to be in this case) is ipso facto its qualifying reliability. As Bourjaily v. United States, 483 U.S. 171, 183, 107 S. Ct. 2775, 972 L. Ed. 2d 144 (1987), states:

> [N]o independent inquiry into reliability is required when the evidence "falls within a firmly rooted hearsay exception." ... [A] court need not independently inquire into the reliability of such statements.

In Idaho v. Wright, 497 U.S. 805, 817, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990), the Supreme Court spoke to a similar effect:

Admission under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements.

See also Chapman v. State, 331 Md. 448, 457, 628 A.2d 676 (1993); Head v. State, 171 Md. App. at 663.

In dealing with the Dying Declaration, or any other exception to the Rule Against Hearsay, the reliability focus is on the credibility of the hearsay declarant. This is totally different from constitutional identification law, where the reliability focus is on the accuracy of an extrajudicial identification (which we will be discussing infra). These are distinct reliabilities and should not be commingled.[13]

---

[13]Reliability is not a constant, and neither, therefore, is a set of reliability factors. Reliability is an abstract concept until anchored to the concrete reality of a particular predicate. The reliability of a hearsay exception is one thing. Its factors focus on the credibility of the hearsay declarant. The reliability of an extrajudicial identification, on the other hand, is something quite different. Its factors focus on the accuracy of the identification. One cannot take reliability factors from the context of assessing extrajudicial identifications and transplant them into the very different soil of assessing the admissibility of exceptions to the Hearsay Rule.

A so-called reliability factor, ironically, may point in conflicting directions depending upon the context in which it is called upon to operate. The state of excitement, which is the very raison d'être of the Excited Utterance exception to the Rule Against Hearsay, is a case in point. It is generally recognized that the excitement may actually diminish the accuracy of the utterance even as it enhances the credibility of the utterer. It is the latter consideration that "trumps" the former consideration and makes the Excited Utterance admissible. See Michigan v. Bryant, 562 U.S. ___, 131 S. Ct. 1143, 1161 n.12, 179 L. Ed. 2d 93 (2011). We must not neglect context.

For the Dying Declaration, the self-sufficient guarantor of reliability was expressed by Idaho v. Wright, 497 U.S. at 820, as it quoted from Regina v. Osman, 15 Cox Crim. Cas. 1, 3 (Eng. N. Wales Cir. 1881):

> [N]o person, who is immediately going into the presence of his Maker, will do so with a lie upon his lips.

The state of the dying declarant's mind that is the guarantee of the declaration's reliability was also well expressed by the Supreme Court in Shepard v. United States, 290 U.S. 96, 100, 54 S. Ct. 22, 78 L. Ed. 196 (1933):

> There must be "a settled hopeless expectation" ... that death is near at hand, and what is said must have been spoken in the hush of its impending presence.

The fundamental rationale is a simple one. The law looks upon all human sources of information with a healthy skepticism. It, therefore, subjects those sources to various trustworthiness conditioning devices.[14] For a witness in the courtroom, there is the tripartite conditioning of having the live witness heard and observed by the factfinders, the administration of the oath, and cross-examination. When the source of information is an out-of-court declarant rather than a witness in court, the law has historically sought alternative trustworthiness conditioning devices. The acceptance of certain alternative conditioning devices has produced the list of firmly-rooted hearsay exceptions. For the Dying Declaration exception, the declarant's hearing of the fluttering of the wings of the

---

[14]The first trustworthiness conditioning device that many of us remember was on a third grade playground. It was, "Cross your heart and hope to die?"

dark angel was the self-sufficient guarantee of the declarant's reliability. That is all the reliability that is required. Additional circumstances may be considered at trial, but they go to weight and not to threshold admissibility.

## Immateriality No. 5: Subsequent Investigative Behavior

The suppression court acknowledged that this final factor "is not as controlling as the others" but it seemed to take the State to task for not taking advantage of its two-year window of opportunity to come up with some better evidence of identification, less sensitive and less borderline:

> Not lost on the court is the fact that the police and State had 2 years to address the difficult issue of Pate's identification of Hailes. The court understands from his reviewing the medical notes that Pate was in and out of hospitals during this time, certainly more could have been done.

Ours, however, is not to critique the performance of the Prince George's County Police Department nor that of the Prince George's County State's Attorney's Office. It is but for us to evaluate a discrete wisp of evidence, the admissibility of which was, for better or for worse, a <u>fait</u> <u>accompli</u> on November 26, 2010. Admissibility depended entirely on the state of mind of the declarant at the moment he made the declaration. For purposes of our legal ruling we are in a time warp that does not exist outside November 26, 2010. If the Dying Declaration was inadequate when made, nothing in the ensuing two years can cure that inadequacy. If it was adequate when made, nothing in the ensuing two years will diminish that adequacy. The event on which we focus is frozen in time. All subsequent time does not exist.

- 51 -

## V. The Extrajudicial Identification

It seems to us, although it is by no means transparently clear, that two major exclusionary issues were before the suppression hearing court for decision. The constitutional propriety of the extrajudicial identification and the constitutional (as well as common law) adequacy of the Dying Declaration were separate and distinct issues that did not merge into one. A constitutionally unassailable extrajudicial identification, for instance, will not make a Dying Declaration admissible. By the same token, a constitutionally deplorable extrajudicial identification will not make its antecedent Dying Declaration bad. The two issues rise and fall independently. In listing the issues before the suppression hearing that needed to be decided, the court, indeed, stated the second issue as:

> Was the photo array submitted by Officers Green and Everett to the victim, Melvin Pate, unduly suggestive and constitutionally defective?

"Unduly suggestive" is, of course, the language of constitutional identification law and not the language of hearsay exception law. Although, by the end of the court's Memorandum Opinion, some of the identification law discussion seemed to leak into the Dying Declaration ruling, we will focus on the identification ruling exclusively in the context of constitutional identification law.

Identification law now operates under the big tent of the Wade-Gilbert-Stovall trilogy[15] and the decade of furious constitutional activity that it generated between 1967 and

---

[15]United States v. Wade, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967);
(continued...)

1977. Early in that decade, the actual exclusion of pretrial identifications was the doctrinal rage, when most of the early violations were of the Sixth Amendment Right to the Assistance of Counsel. As the prosecution shored up its procedures on that front, however, and as the primary focus of identification law shifted to the Due Process Clause of the Fourteenth Amendment and the issue of reliability, actual exclusion withered away to a small fraction of what it earlier had been.

In Turner v. State, 184 Md. App. 175, 178-79, 964 A.2d 695 (2009), this Court described that initial surge and then rapid fading of exclusion, as reliance on the Sixth Amendment right to counsel proportionately faded:

> Beginning with the promulgation of the Wade-Gilbert-Stovall trilogy on June 12, 1967, the constitutionality of extrajudicial identifications shot into prominence and then dominated the center stage until its run ended ten years and four days later with the promulgation of Manson v. Brathwaite. Early in the run, following the lead of United States v. Wade, and Gilbert v. California, and relying on an accused's Sixth Amendment right to counsel at any critical stage, the exclusion of identification evidence as a matter of constitutional law was in high vogue. That exclusionary trend, however, ebbed significantly with the holding in Kirby v. Illinois (1972) that a suspect placed in a pre-indictment, as opposed to a post-indictment, line-up did not yet enjoy the protection of the Sixth Amendment. Whatever little wind still propelled the exclusionary sails after Kirby effectively drifted away with the holding in United States v. Ash (1973) that even a post-indictment exhibition of a photograph of a suspect, either in a group picture or as part of an array of individual photographs was, unlike standing the suspect in a live line-up, not a critical stage.

_____

[15](...continued)
Gilbert v. California, 388 U.S. 263, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967); Stovall v. Denno, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967).

(Emphasis supplied).  In <u>Conyers v. State</u>, 115 Md. App. 114, 117, 691 A.2d 802 (1997), this Court described how the quick reaction of the police essentially outflanked almost all of the Sixth Amendment hurdles.

> <u>In short order, the police adjusted their identification procedures so as to avoid almost entirely any Sixth Amendment problems.</u>  They either 1) used some identification modality, such as a photographic array, that was not a critical stage, instead of a live police lineup or 2) made sure that a police lineup was used only for a suspect who was not yet an "accused."

(Emphasis supplied).

With the almost overnight diminution of the Sixth Amendment problem, the primary attention of identification law turned to reliability under the Due Process Clause.  <u>Conyers</u>, 115 Md. App. at 117, recounted the shift:

> <u>As the Sixth Amendment aspect of the new constitutional phenomenon dramatically waned within the first half decade</u>, the Supreme Court did point out that <u>there remained a residual Fourteenth Amendment reliability issue</u> even for some of those who did not enjoy a Sixth Amendment right to counsel.  <u>Stovall v. Denno</u> established that <u>a pretrial identification procedure could violate the Due Process Clause</u> of the Fourteenth Amendment <u>if it were impermissibly (unnecessarily) suggestive.</u>  It is not enough for exclusionary purposes, however, that the procedure be suggestive if the police have no choice in the matter.  <u>It is required that the procedure be not only 1) suggestive but also 2) impermissibly so.</u>

(Emphasis supplied).

In assessing reliability, identification law now looks primarily to <u>Neil v. Biggers</u>, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and <u>Manson v. Brathwaite</u>, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).  <u>Conyers</u> explained:

- 54 -

The due process criterion was more fully fleshed out in <u>Simmons v. United States</u> and reached full flower in <u>Neil v. Biggers</u> (1972), and <u>Manson v. Brathwaite</u> (1977). <u>The final definition for an excludable pretrial identification became "one that was so [1] impermissibly [2] suggestive [3] as to give rise to a very substantial likelihood of irreparable misidentification." The third requirement massively curtailed the applicability of the first two and effectively returned identification law to where it had been before the Wade-Gilbert-Stovall trilogy enjoyed its brief moment in the sun.</u>

<u>With Manson v. Brathwaite in 1977, the constitutional phase of identification law had largely run its course.</u>

115 Md. App. at 117-18 (emphasis supplied).

Ironically, the suppression hearing court in this case, albeit ultimately suppressing the identification pursuant to the <u>Neil v. Biggers</u> and <u>Manson v. Brathwaite</u> reliability factors, had earlier ruled that the identification by the dying declarant of the appellee's photograph passed constitutional muster. The issue was posed as a straightforward reliability problem pursuant to the Due Process Clause:

> <u>Hailes contends that the photo identification violates the Due Process Clause</u> of the Fourteenth Amendment. <u>He submits that the procedure</u> of the officers <u>was impermissibly and unnecessarily suggestive.</u> <u>Hailes seeks the exclusion of the videotape</u> showing that Pate picked Hailes as the individual who shot him.

(Emphasis supplied). The court then quoted at length and relied on the passages from <u>Conyers v. State</u> that we have just quoted. It found as a matter of fact that the photographic array presented to Pate was not unduly suggestive.

> The photo array presented to Pate shows six African American males, all with dreadlocks, all with similar or near similar facial features, all with similar complexions, and all with the same or similar facial hair. <u>The court notes that the photo array</u> in which Hailes is depicted <u>is not unduly suggestive.</u>

- 55 -

> The second array in which Pate identified another participant <u>also has no defects and shows no undue suggestiveness from one picture to the other.</u>

(Emphasis supplied). We resolutely affirm that finding of fact as not clearly erroneous.

The ruling of the suppression court, which seemed as if it were the ultimate ruling on the identification issue, was clearly that the extrajudicial identification procedure was not impermissibly suggestive and did not, therefore, constitute a violation of Due Process.

> The court acknowledges that the display of this photo array is different than any array he has experienced during his 16 years as a criminal defense attorney or nearly 12 years as a Judge. Notwithstanding that fact, <u>the method, the display, and the manner of Pate picking Hailes as the person that shot him does not violate the Due Process Clause of the Fourteenth Amendment.</u>

(Emphasis supplied).

That ruling, with which we completely agree and would readily affirm, would seem to have ended the matter. An extrajudicial identification that is not impermissibly suggestive will not be suppressed. Any extrajudicial identification that is ruled to be NOT IMPERMISSIBLY SUGGESTIVE will not be excluded. There is no additional inquiry or further analysis that is required. Any residual question as to the reliability of the identification is a matter to be fought out by examination and cross-examination and is ultimately to be resolved by the jury. It is quintessentially an issue of fact and not an issue of law.

Twenty-three pages further along in the Opinion and Order of Court, however, the court listed the five reliability factors set out by <u>Neil v. Biggers</u> and <u>Manson v. Brathwaite</u>.

In identification questions, the courts have long looked to five factors in assessing reliability:

1. The opportunity of the witness to view the criminal at the time of the crime;
2. The witness's degree of attention;
3. The accuracy of the witness's prior description of the criminal;
4. The level of certainty demonstrated by the witness at the confrontation; and
5. The length of time between the crime and the confrontation.

The court then seemed to find that the photographic identification, which it had earlier ruled to have been NOT IMPERMISSIBLY SUGGESTIVE, was nonetheless not reliable.

These factors are important for the trier of fact to assess the reliability of the identification. Typically, they can be elicited through examination by the State or through cross-examination by the defense. This case lacks the critical examination of how Pate viewed his shooter. The inability of Hailes's defense team to explore Pate's viewing and recollection of the shooting runs afoul of Hailes's Sixth Amendment right of confrontation.

(Emphasis supplied).

There is a strong suggestion that the ruling is not a revisiting of the identification issue per se, but is rather a reference to the reliability factors to emphasize the need for confrontation and cross-examination. Neil v. Biggers and Manson v. Brathwaite, however, have nothing to do with Dying Declaration law and they have nothing to do with the Confrontation Clause. The Biggers-Brathwaite reliability factors, moreover, are not criteria for resolving Confrontation Clause problems. The larger issue of whether the Dying

- 57 -

Declaration generally is or is not exempted from the coverage of the Confrontation Clause does not turn on whether cross-examination would have been helpful to the appellant in this case.

The function of these sets of reliability factors is to implement what Simmons v. United States, 390 U.S. at 384, was referring to as it explained that even an impermissibly suggestive extrajudicial identification is not suppressible unless it is so impermissibly suggestive "as to give rise to a very substantial likelihood of irreparable misidentification."

The two distinct issues of identification and confrontation seem to have been scrambled together. The suppression court seemed to be using the reliability criteria of identification law to resolve a Confrontation Clause problem. To be absolutely safe, we feel compelled to treat this ruling both ways. As a Confrontation Clause issue, we have already held that the Dying Declaration is exempt from the coverage of the Confrontation Clause and we would, therefore, reverse a ruling based on confrontation.

If, on the other hand, we treat this, arguendo, as a ruling based on identification law, we would find two fatal flaws in the ruling. In the first place, one does not, as we have explained, supra, even look to the Biggers-Brathwaite reliability factors unless and until there has first been a finding of impermissible suggestiveness. One does not suppress an identification on the basis of the reliability factors, whichever way the reliability analysis might come out. The examination of the reliability factors is not an exclusionary measure.

- 58 -

It is an anti-exclusionary measure.  The reliability factors, even when they are not satisfied, do not trigger suppression.

Before the reliability factors are even addressed, there must first be a finding of impermissible suggestiveness.  As Stovall v. Denno pointed out, mere suggestiveness does not call for exclusion.  It is not a Due Process violation per se that an identification procedure is suggestive.  It must be not only suggestive, but impermissibly suggestive.  It is the impermissibility of the police procedure that justifies constitutional exclusion, not the reliability of the identification nor even the suggestiveness of the procedure.  This Court made this point emphatically in Conyers v. State, 115 Md. App. at 120:

> That entire issue of reliability was never put forth by the Supreme Court as an additional ground for excluding an extrajudicial identification.  It was, by diametric contrast, a severe limitation on such exclusion.  Simmons, Biggers, and Manson v. Brathwaite unequivocally established that not all impermissibly suggestive procedures call for exclusion, but only those impermissibly suggestive procedures that would actually give rise to a very substantial likelihood of irreparable misidentification.  Until a defendant establishes impermissive suggestiveness in the first instance as a basis for presumptive exclusion, therefore, a court does not even inquire, by looking at the suggested reliability factors, into whether the State is entitled to an exemption from that presumptive exclusion.  The reliability inquiry, in short, is not an additional ground for exclusion but is, rather, a limitation on exclusion.  The appellant's argument was simply not on point.  He never reached the stage where reliability even became material.

(Emphasis supplied).

In Perry v. New Hampshire, 565 U.S. ____, 132 S. Ct. 716 181 L. Ed. 2d 694 (2012), the Supreme Court explained that until we have a finding of unnecessary suggestiveness (which we do not have in this case), the Due Process Clause is not even engaged:

> The Court emphasized, first, that <u>due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary.</u>

132 S. Ct. at 724 (emphasis supplied).

The paradigmatic sets of reliability factors of <u>Neil v. Biggers</u> and <u>Manson v. Brathwaite</u>, identical to each other, were foretold by <u>Simmons v. United States</u>, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968). <u>Simmons</u> established that even an impermissibly suggestive extrajudicial identification will not be excluded unless it is "one that is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384. <u>Neil v. Biggers</u> and <u>Manson v. Brathwaite</u> now measure that extra dimension when it becomes necessary to consider it. Until an identification procedure has been found to be suggestive, therefore, a reviewing court does not go on to inquire whether it was so suggestive as to "give rise to a very substantial likelihood of irreparable misidentification." A consideration of the reliability factors is not a possible reason for exclusion. It is rather an anti-exclusionary rebuttal of what might otherwise be a presumptive exclusion. In this case, the procedure was ruled to have been non-suggestive. Until the threshold of impermissible suggestiveness has been reached, the analysis does not go on to the second step of considering reliability.

There is yet a second impediment to a suppression ruling that might have been based on the reliability factors. Since the early 1970s, the Supreme Court has consistently emphasized that the reliability of an identification is essentially a balancing question for a

fact-finding jury and not a subject for constitutional exclusion. <u>Manson v. Brathwaite</u>

signaled the dramatic change in emphasis.

> [<u>I</u>]<u>nflexible rules of exclusion</u>, that may frustrate rather than promote justice,
> <u>have not been viewed recently by this Court with unlimited enthusiasm.</u>

432 U.S. at 113 (emphasis supplied).

Except in extreme cases, the Supreme Court has been content to let the

trustworthiness of an identification be left to a common sense weighing process by lay

jurors.

> Surely, we cannot say that under all the circumstances of this case there is a
> "a very substantial likelihood of irreparable misidentification." <u>Short of that</u>
> <u>point, such evidence is for the jury to weigh. We are content to rely upon the</u>
> <u>good sense and judgment of American juries, for evidence with some element</u>
> <u>of untrustworthiness is customary grist for the jury mill. Juries are not so</u>
> <u>susceptible that they cannot measure intelligently the weight of identification</u>
> <u>testimony that has some questionable feature.</u>

432 U.S. at 116 (emphasis supplied). See also <u>Perry v. New Hampshire</u>, 132 S. Ct. at 724;

<u>Smiley v. State</u>, 216 Md. App. at 32 ("The Supreme Court in <u>Perry v. New Hampshire</u>

virtually pronounced an obituary over the use of exclusion in challenged identification

cases.").

Whether based on identification law under the Due Process Clause or on the Sixth

Amendment Confrontation Clause, the suppression order was that "the videotape of Melvin

Pate's identification of Jermaine Hailes ... will be excluded from exhibition to the jury in this

matter." We reverse that suppression order and remand the case to the circuit court for trial.

## A Retrospective

A nagging question remains of just why this case has been so difficult to get a clean handle on – for the suppression hearing court and for this Court alike. The answer would seem to lie in the highly unusual circumstance that the content of a Dying Declaration just happened to be the actual making of an extrajudicial photographic identification. That coinciding of two separate but weighty problems tended, inevitably, to fuse the issue of Sixth Amendment confrontation and the issue of Fourteenth Amendment reliability into a seemingly indivisible totality, whereas those issues needed to kept as separate and distinct.

If the Dying Declaration analysis had hypothesized that the modality of the communication had been not an unusual blinking at a photograph but the more comfortable spoken words, "Hailes shot me," the analysis would have reached the same result we reached, but without the extraneous complication of identification concerns. If the identification analysis, on the other hand, had hypothesized that the police procedure yielded a reassuring, "I pick number three," by a live witness fully expected to be present at the trial, that familiar factual scenario would have produced precisely the result we have reached, but without the extraneous complication of confrontation concerns. Our most challenging problem has been trying to disentangle what should have been two unrelated issues clinging desperately to each other as if they were one.

**ORDER OF SUPPRESSION REVERSED AND CASE REMANDED FOR TRIAL; COSTS TO BE PAID BY APPELLEE.**

- 62 -